**Alexander Lionel LeCLAIR, Petitioner,**

**v.**

**Judge Donald E. POWERS, District Court of Lincoln County, Oklahoma, Respondent.**

**No. 55456.**

Supreme Court of Oklahoma.

Feb. 3, 1981.

---

Gary S. Pitchlynn, Oklahoma City, for petitioner,

Richard James, James & Gilmore, P. C., Stroud, for respondent.

WILLIAMS, Justice.

Petitioner, Alexander Lionel LeClair has filed with this court an application to assume original jurisdiction and petition for writ of prohibition in which he requests a determination be made that personal service of summons upon an Indian person in Indian country does not vest an Oklahoma district court with personal jurisdiction. Petitioner further asks that this court direct the District Court of Lincoln County to vacate the judgment rendered against petitioner and also dismiss the contempt citation issued.

As gathered from the oral presentation, briefs, exhibits and affidavits, the pertinent facts appear to be as follows.

On November 30, 1979, Georgia A. LeClair filed suit for divorce against the petitioner in the named court. On this same date an order was issued advising defendant-petitioner of plaintiff's application for payment of temporary support, an attorney's fee and costs. In addition, the order advised that the matter was set for hearing on December 5, 1979, and directed the parties to appear.

The parties agree that also on November 30, 1979, summons was issued by the clerk of that court and mailed to the sheriff of Pawnee County.[1] It informed him that defendant-petitioner worked at the Pawnee Indian Hospital and could be served there. According to an affidavit of petitioner, personal service was accomplished there on December 3, 1979, and the summons was returned and filed in the issuing clerk's office on December 6, 1979.

Evidently following service upon himself, the petitioner wrote respondent judge on December 3, 1979. He acknowledged receipt of service, informed respondent that he did not have time to seek the advice of counsel before the hearing on the morning of December 5th and further that he was without transportation to the hearing. Petitioner also stated in this letter that he considered the $500.00 per month request for temporary support and alimony to be "exorbitant."[2]

On December 5, respondent heard plaintiff's application for a temporary order. Petitioner did not appear. Respondent gave temporary custody of the parties' children to the wife. He ordered that she have the right to use and occupy the parties' home at Stroud, Oklahoma. It was further ordered that a temporary support payment of $300.00 per month be paid by petitioner to trial court plaintiff.

On January 3, 1980, petitioner's wife filed an application for citation for contempt alleging that petitioner had failed to make support payments. Respondent ordered petitioner to appear at a show cause hearing on January 16, 1980. Petitioner was notified but failed to appear and a bench warrant was issued.

The divorce trial was held April 30, 1980. Petitioner again failed to appear and the district court entered its decree of divorce.

Petitioner was arrested on May 23, 1980. He was released on bond that day and his hearing on the contempt citation was set for July 2, 1980.

Petitioner on May 30, 1980, filed in the district court a "Motion to Dismiss" and a "Motion to Quash Summons and Vacate Judgment" in the divorce case. In these pleadings he alleged that he was an American Indian and a member of the Ponca Indian Nation; that he resides on Indian country as defined by 18 U.S.C. § 1151; that he is employed by the Indian Health Service which is located upon trust property of the Pawnee Tribe and which is also Indi-

1. We note that a copy of the summons furnished to this court recites that it was witnessed and signed by the clerk November 29, 1979.

2. Respondent contends that petitioner, by his letter made a general appearance and waived any right to later challenge the jurisdiction of the state district court.

No Oklahoma authority was cited by the parties concerning whether or not a letter is sufficient to warrant treatment as an appearance, nor did we find any in our research. Decisions in other jurisdictions offer some guidance.

In *Rutherford v. Bentz*, 345 Ill.App. 532, 104 N.E.2d 343, 346 (1952), the court held, "A telegram ... or a letter, while addressed to the judge, as the judge of the Circuit Court of Champaign County, is to the individual and not the Court." In *Fortier v. Gumelsky*, 37 So. 741, 742 (La.1920), it was stated, "a letter cannot be made to take the place of a regular appearance in court."

In *Litsinger Sign Co. v. American Sign Co.*, 11 Ohio St.2d 1, 227 N.E.2d 609 (Ohio 1967), the court holding a letter could not constitute a general appearance there noted the letter with which it was concerned "did not assert any defense or ask any relief in connection with the merits."

Upon examination of the letter which has been submitted as an exhibit to this court, we note first that it is addressed to respondent as "United States District Judge." As stated, the content of the letter acknowledges that petitioner was served with summons on December 3, 1979, and was aware of the hearing scheduled at ten o'clock a. m. on December 5, 1979. Petitioner explained that he lacked sufficient time to contact counsel "much less retain one" and that he had no means of transportation and would be unable to attend the hearing.

Petitioner's comment upon the amount requested for temporary support was that it was "exorbitant." His request for relief was simply the statement, "I plead and throw myself on the mercy of the court."

It is our determination that the letter, viewed in light of the considerations set forth in the above cases, failed to constitute a general appearance by petitioner.

an country; that he was served with summons while working at the Indian health service unit and that therefore the state district court did not gain jurisdiction over him.

The motions were heard June 25, 1980, by respondent and both were overruled. Petitioner then filed here the present original action.

In petitioner's briefs and pleadings he maintains the Indian hospital is located upon Indian country, as defined by 18 U.S.C. § 1151;[3] that pursuant to the case of State v. Littlechief, 573 P.2d 263 (Okl.Cr. 1978), Oklahoma has never removed its constitutional impediment to the exercise of its civil and criminal jurisdiction over Indian country and therefore the service of process upon petitioner in Indian country failed to vest jurisdiction in the state district court and finally that service of process was void for the reason that the Ponca tribe and its court of Indian offenses were the only appropriate authorities to effect service.

Little evidence is before us upon which to base a determination of whether or not the Pawnee Indian Hospital is either a reservation or a dependent Indian community as petitioner asserts.[4]

In C. M. G. v. State, 594 P.2d 798 (Okl.Cr. 1979), the Court of Criminal Appeals was called upon to determine whether the Chilocco Indian School was Indian country. Cited in that opinion is an extended, thorough list of stipulated facts concerning, among other things, a description of the surrounding area, the school's student body, employees, funding, and administration. With such information at hand, the court in C. M. G. was readily able to examine Federal case law, most of which is cited as authority in the instant case, and it there determined Chilocco met the definition of a dependent Indian community (Indian country).[5]

■ We are of the opinion that such a determination in the matter at hand is unnecessary and indeed unwise in view of the absence of evidence before us either pro or con. Moreover, were we to determine that service of process in fact took place upon Indian country, the petitioner would still err as to his contention that the state court lacked jurisdiction in this case whose particular facts we shall now discuss.

Of principal importance is the absence of any allegation or proof by petitioner that the parties resided upon Indian country during their marriage. No tie between their family and the area said to be Indian

3. Section 1151 provides the following definition of Indian country, "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the boarders [sic] of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

4. The only indication this court has pertaining to this issue is a copy of Pub.L.No. 90–546, 82 Stat. 935, which provides in pertinent part that: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all right, title, and interest of the United States in the following described lands and improvements thereon,

embraced in the Pawnee school and agency reserve, and in four cemetery sites, comprising seven hundred twenty-six and three one-hundredths acres, more or less, are hereby declared to be held by the United States in trust for the benefit of the Pawnee Tribe of Oklahoma, subject to valid existing rights-of-way, and subject to the right of the United States to use, without compensation, a tract of land comprising approximately five and forty-six one-hundredths acres, together with facilities located thereon or hereafter installed, which are now used by the United States Public Health Service: .... "

5. A case relied upon and quoted from by the court in C. M. G., dealing with the determination of Indian country was United States v. Martine, 442 F.2d 1022 (10th Cir. 1971), which indicated consideration should be given to "the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area."

country is asserted other than petitioner's place of employment and his home during the "pendency" of this action was there.[6]

We note that in the decree of divorce, petitioner's former wife was awarded the leasehold right to the home in Stroud, Oklahoma, where it recites, she and their children have resided for more than six months. It is unknown if petitioner also resided here during the marriage.

Finally, it is unsettled whether or not petitioner's former wife was herself an Indian.[7]

Article 7, Section 4 of the Constitution of Oklahoma provides "the District Court shall have unlimited original jurisdiction of all justiciable matters...." The district courts in Oklahoma have in the past granted divorces in cases involving Indians. *Whitehorn v. Whitehorn,* 170 Okl. 152, 36 P.2d 943 (1934); *LeClair v. Calls Him,* 106 Okl. 247, 233 P. 1087 (1925), (upholding district court's order setting aside divorce decree). Although there is no indication that the particular contentions here raised were presented in those decisions, other jurisdictions have addressed questions similar to those which we must now decide. We deem an examination of them helpful.

The case of *Bad Horse v. Bad Horse,* 517 P.2d 893 (Mont.1974), involved a jurisdictional question arising in a divorce between two Indians residing upon a reservation. The defendant was served with process on the reservation. He claimed the state court lacked both subject matter and personal jurisdiction over him. The Montana Supreme Court found its district court had been granting divorces to Indian people since at least 1937, that members of Indian tribes in Montana were also citizens of the United States and Montana and that as a general rule Indians could maintain a suit in state court the same as all other persons. The court concluded it had subject matter jurisdiction over the divorce action.

Present in *Bad Horse* was a provision from the applicable tribal code providing that marriages and divorces were to be consummated in accordance with the laws of Montana. This, the court determined, prevented any purported claim of state interference with the operation of the tribal court and Indian affairs.

The *Bad Horse* opinion also addressed the validity of service of process on an Indian defendant within the exterior boundary of a reservation. The Montana court stated:

> Once the district court has assumed jurisdiction over the subject matter and process has been properly served, the defendant cannot throw up a shield around herself by claiming that the state process server cannot pierce the exterior boundaries of an Indian reservation and serve civil process therein.
>
> In the instant case the marriage "contract" took place off the reservation. There has been no preemption by the federal government which could prevent the transfer of jurisdiction to the state. There is no disclaimer made and there is no infringement on the right of the tribe to govern itself. Indian country is not a federal enclave off limits to state process servers. Service of process extends to an Indian defendant served within the Fort Peck Reservation.

In *State Securities, Inc. v. Anderson,* 84 N.M. 629, 506 P.2d 786 (N.M.1973), relied upon by respondent and cited by the Montana Supreme Court in *Bad Horse,* the New Mexico Supreme Court determined that its state courts could obtain jurisdiction over an Indian residing on an Indian reservation by issuing process upon the Indian while he was on the reservation. The cause of action involved there arose from a contract entered into by the Indians while off the reservation. Relying upon an article containing what they considered a "reasonable summary" of the law in this area, the court quoted the following language therefrom:

---

**6.** Petitioner in his affidavit only went so far as to state that during the pendency of this lawsuit he had resided on property allotted to his family.

**7.** In an affidavit, petitioner asserts that his former wife is a member of the Sac and Fox Tribe. Respondent replied in his brief that there was no evidence before the court to show that the wife was an Indian nor if she was, to what tribe she belonged.

It may be, then, that exclusive Indian jurisdiction exists when an action involves a proprietary interest in Indian land; or when an Indian sues another Indian on a claim for relief recognized only by tribal custom and law; or, subject to the Fourteenth Amendment argument, when an Indian is suing or being sued by another Indian or non-Indian over an occurrence or transaction arising in Indian country about which the Tribe does, or foreseeably will, in the exercise of its police power, assume sovereign control through tribal law, court, or executive action.[8]

The court concluded in the matter before it that no proprietary interest in land was involved nor was one Indian suing another Indian over a claim recognized only by tribal law nor did the transaction arise in Indian country.

We find the reasoning of the Montana and New Mexico courts influential upon the question here. To be remembered in the case at bar is that unlike the situation in *Bad Horse* or *State Securities* the parties before the trial court appear to have had no tie with the area purported to be Indian country other than petitioner's place of employment was there and he had resided there "during the pendency of this lawsuit."

We are aware of the Federal District Court's order in *U. S. v. Littlechief*, 573 P.2d 264 (W.D.Okl.1977), reproduced in full in *State v. Littlechief*, supra, but do not believe it to be applicable to the particular facts of this case.

In *Littlechief*, the Indian defendant was charged with a crime occurring upon Indian country. There can be no doubt that the essential element to the Federal court's decision was the fact the crime was committed in Indian Country. Had Littlechief been charged with committing the crime at a location in this State other than Indian country, we think it would be unquestioned that Oklahoma would have had jurisdiction to proceed with prosecution.

■ Petitioner's final contention is that service of process in this case was void for the reason that "the appropriate authority to effect service of process [was] ... the Ponca Tribe and their duly adopted court of general jurisdiction, the Court of Indian Offenses of the Ponca Tribe of Indians, Pawnee Agency, Oklahoma." He asserts that this tribal court regularly issues summonses and subpoenas upon Indian country pursuant to its rules and procedures embodied at 25 C.F.R. Part 11, and tribal government resolutions.[9]

Service by the State according to its own procedures is asserted as an interference with the self-governing activities of the Indian tribe. That authority [10] relied upon by petitioner we find distinguishable and of no persuasive effect for both cases turn upon specific provision in the involved tribal code which were disregarded.

8. Ransom and Gilstrap, Indians—Civil Jurisdiction in New Mexico State, Federal and Tribal Courts, 1 N.M.L.Rev. 196 (1971).

9. Petitioner has furnished this court with a resolution of the United Indian Tribes of Western Oklahoma and Kansas, Inc., wherein the rules and procedures of 25 C.F.R. Part 11 were adopted by those tribes under the jurisdiction of the Bureau of Indian Affairs of the Anadarko Area Office, Anadarko, Oklahoma. Petitioner makes no mention of whether said federal regulations were adopted as the tribal code for the Court of Indian Offenses of the Ponca Tribe. We infer, that with little variation, they were.

10. Petitioner cited *State ex rel. Merril v. Turtle*, 413 F.2d 683, 686 (9th Cir. 1969) and *Benally v. Marcum*, 89 N.M. 463, 553 P.2d 1270 (N.M. 1976).

The *Turtle* case involved a situation where extradition of an Indian from the Navajo Reservation was sought by the State of Oklahoma. Application by this State to the tribal council had been unsuccessful because Navajo tribal law provided for extradition to only three states, none of which were Oklahoma. Oklahoma authorities then requested the governor of Arizona to extradite the Indian, and the dispute arose.

The Federal Circuit Court's opinion held that in view of the applicable tribal procedures present for securing extradition, the State of Arizona lacked jurisdiction to proceed. With regard to the Tribe's procedure, the court stated: "The Tribe has thus codified and does now exercise its extradition power. This power cannot now be assumed by or shared with the State of Arizona without 'infring[ing] on the right of reservation Indians to make their own laws and be ruled by them' " [citing *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)].

In the situation at hand we have examined the federal rules and procedures set forth at 25 C.F.R. Part 11 (1980) as petitioner has suggested but find no provision concerning the procedure by which service of process of an Oklahoma district court upon an Indian may be had. Petitioner specifies no particular provision nor has any separate resolution of the tribe whose self-government was purportedly interfered with been brought to our attention.

The New Mexico Supreme Court in *State Securities, Inc. v. Anderson*, supra, examined whether immunity from process was necessary to avoid interference with tribal self-government, a jurisdictional test set forth by the United States Supreme Court in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). No interference with Indian self-government was found. We also find none.

For the above reasons, we assume jurisdiction and deny petitioner's request for writ of prohibition.

IRWIN, C. J., BARNES, V. C. J., and LAVENDER, SIMMS, HARGRAVE and OPALA, JJ., concur.

In *Benally v. Marcum* there was also present a specific procedure for extradition set forth in the Navajo Tribal code. Citing the *Turtle* case, the New Mexico Supreme Court found in view of such provisions that the control of the extradition process is inherent in the tribal sovereignty of the Navajo Tribe.