2004-NMCA-131

102 P.3d 646

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Roland H. BRANHAM, Defendant–Appellee.**

No. 24,309.

Court of Appeals of New Mexico.

Sept. 30, 2004.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Max Shepherd, Assistant Attorney General, Albuquerque, NM, for Appellant.

John Bigelow, Chief Public Defender, Kathleen T. Baldridge Assistant Appellate Defender Santa Fe, NM, for Appellee.

## OPINION

WECHSLER, Chief Judge.

{1} The State of New Mexico appeals the district court's grant of Defendant's motion to suppress evidence because Defendant was driving on a road within the Mescalero Apache Indian Reservation and was stopped by a New Mexico state police officer. The State argues that the district court erred in concluding that there was no agreement be-

tween the Bureau of Indian Affairs (BIA) and/or the Mescalero Apache Tribe and the New Mexico state police authorizing the state police to patrol the Mescalero Reservation. In the alternative, the State argues that even if there was no agreement authorizing the state police to patrol the Mescalero Reservation, the state police officer who arrested Defendant conducted a citizen's arrest. Because we conclude that the officer was without authority to enforce Mescalero tribal traffic ordinances and because the State did not preserve its remaining argument, we affirm.

### Factual and Procedural History

{2} The facts are not in dispute. On August 31, 2002, New Mexico State Police Officer Gerard Silva was patrolling Highway 70 in the Mescalero Apache Indian Reservation. He observed Defendant driving 45 mph in a 35 mph zone on Mescalero 6, which is not within a state right-of-way and is not maintained by the state. Officer Silva turned on his emergency lights and pursued Defendant, who pulled over a short time later on Highway 244, a state road not located on the Mescalero Reservation. Officer Silva observed Defendant "staggering" and "swaying" as he emerged from his vehicle. The events following the stop resulted in Defendant being charged with DWI, driving with a suspended or revoked license, two counts of resisting, evading, or obstructing an officer, and one count of speeding.

{3} Defendant filed a motion to suppress evidence, arguing that Officer Silva's initial traffic stop was unlawful because, as a New Mexico state police officer, Officer Silva did not have authority to enforce Mescalero Apache traffic ordinances. At the hearing on the motion, Officer Silva testified that he believed he had "full, unfettered authority" to conduct traffic stops within the reservation. Officer Silva also testified that he patrolled the Mescalero Reservation at the request of the Mescalero tribal police. Officer Silva stated that his captain had been asked by the tribe to have state police officers patrol the reservation in order to augment tribal police, who were shorthanded.

{4} The State also called Chief Morgan Troy Bolen as a witness. Chief Bolen testified that he was a BIA officer and additionally acted as Chief of Police for the Mescalero Tribe. Chief Bolen stated that after he became Chief of Police in 1999, he determined that he did not have a sufficient number of officers to patrol the reservation. He therefore entered into an informal verbal agreement with the New Mexico state police and the Otero County Sheriff's Office. According to Chief Bolen, the agreement was an "open invitation" to the state and county officers to patrol highways on the Mescalero Reservation. Under the agreement, when a state police officer makes a stop on the reservation, the officer must determine whether the individual is a Native American. If the person is Native American, the individual is cited to tribal court; if not, the individual is cited to state court. Chief Bolen also testified that the tribal council members and tribal courts were aware of, and did not object to, the informal verbal agreement.

{5} On cross-examination, Chief Bolen acknowledged that as a BIA officer he was an employee of the federal government, and, based on 25 U.S.C. §§ 2802, 2803 (1990), the BIA had authority to patrol the reservation. Chief Bolen also acknowledged that he was unaware of any authority authorizing the informal agreement he described. At the conclusion of his testimony, the State argued that Officer Silva had authority to stop Defendant on tribal land because (1) the State has jurisdiction over victimless crimes by non-Indians, (2) there was sufficient evidence of an informal agreement between the state police and the Mescalero Tribe conveying authority to Officer Silva, and (3) the agreement did not infringe on the authority of the tribe. Defendant argued that evidence should be suppressed because neither Congress nor the Mescalero Tribe expressly authorized state police officers to patrol highways on reservation land and because there was no legal authority for the informal agreement.

{6} The district court took the issue under advisement and asked the parties to brief the applicability of 25 U.S.C. § 2804 (2000) and whether it authorized the informal agree-

ment upon which the State relies. Because the State indicated that there might possibly be a written form of the agreement, the district court allowed the State two weeks to produce the agreement in written form. The State never produced the agreement and instead argued that no agreement was necessary because Defendant was a non-Indian and New Mexico has exclusive jurisdiction over non-Indians on the Mescalero Apache Reservation. The district court found that there was no written agreement and that Officer Silva was not commissioned to enforce ordinances of the Mescalero Tribe. As a result, the district court concluded that Officer Silva "was without authority to stop" Defendant and granted Defendant's motion to suppress.

*Authority to Enforce Tribal Traffic Ordinances*

{7} The State argues that the district court erred in concluding that there was no agreement between the BIA and/or the Mescalero Tribe and the New Mexico state police authorizing the state police to patrol the reservation. It contends that there was an actual verbal agreement made by Chief Bolen, which was accepted implicitly by the Mescalero Tribe. Because the State never produced a written agreement, the issue in this case is whether a verbal agreement between the BIA and/or the Mescalero tribal police and the New Mexico state police, and a lack of objection to such an agreement on the part of the Mescalero tribal leaders, is legally sufficient to confer upon the New Mexico state police the authority to enforce tribal traffic ordinances on tribal land.

{8} In reviewing the district court's grant of Defendant's motion to suppress, "[w]e review the district court's ruling ... to determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party." *State v. Cline,* 1998–NMCA–154, ¶ 6, 126 N.M. 77, 966 P.2d 785. We review the legal issue of whether the district court correctly determined that a verbal agreement is insufficient to confer authority upon the New Mexico state police under a de novo standard of review. *See State v. Nieto,* 2000–NMSC–

031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (observing that application of law to facts is subject to de novo review).

{9} The State does not cite any authority generally giving the New Mexico state police jurisdiction or authority to enforce tribal laws on tribal lands. However, § 2804(a) authorizes the BIA to enter into agreements with state law enforcement personnel for the purpose of aiding in enforcement of federal or tribal law within a reservation. Similarly, the New Mexico Mutual Aid Act authorizes "mutual aid agreements" for law enforcement purposes between state agencies and tribal governments or the BIA. NMSA 1978, § 29–8–3 (1971) (Mutual aid agreements).

{10} Section 2804(a) states in pertinent part:

> The Secretary may enter into an agreement for the use ... of the personnel or facilities of a Federal, tribal, State, or other government agency to aid in the enforcement or carrying out in Indian country of a law of either the United States or an Indian tribe that has authorized the Secretary to enforce tribal laws.

We agree with the State that Chief Bolen, as a BIA employee, ostensibly had the authority to enter into an agreement contemplated by § 2804. *See* 25 U.S.C. § 2803(8) (2000) (stating that the Secretary of Interior may authorize employees of the BIA to "when requested, assist ... any Federal, tribal, State, or local law enforcement agency in the enforcement or carrying out of [tribal law]"). The question remains as to whether § 2804 authorizes verbal agreements. We do not believe that it does.

{11} Our duty, when interpreting federal statutes, is to give effect to the intent of the legislative body. *State v. Cleve,* 1999–NMSC–017, ¶ 15, 127 N.M. 240, 980 P.2d 23. In this instance, we endeavor to give effect to the intent of Congress. *Great Am. Ins. Co. v. Brown,* 86 N.M. 336, 339, 524 P.2d 199, 202 (Ct.App.1974) (Hendley, J., specially concurring). When doing so, we may find guidance in federal case law interpreting federal statutes. *See id.* at 340, 524 P.2d at 203 (relying on "principle[s] of federal statutory interpre-

tation" to aid in construing a federal statute which granted the United States exclusive jurisdiction over Indians residing on Indian land).

{12} There is no express language within § 2804, and the State cites to no authority, indicating that Congress intended to grant the BIA authority to enter into verbal or implicit agreements. *See N.M. Cattle Growers Ass'n v. United States Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir.2001) (stating that an appellate court's primary task in construing statutes is to determine congressional intent by using traditional tools of statutory interpretation beginning with the plain language of the law); *United States v. Hess*, 194 F.3d 1164, 1170 (10th Cir.1999) (stating that when construing a federal statute, a court will "give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive" (internal quotation marks and citation omitted)).

{13} It makes sense that Congress intended agreements entered into under § 2804 be written. Such agreements involve the law enforcement obligations and relationships of federal, state, and tribal governmental entities. We would not expect that Congress would intend that existing obligations and relationships be modified without the formality of a writing for the protection of each of the entities. We also would expect that Congress would intend that issues of jurisdiction be formally set forth because of the effect of jurisdictional boundaries on the rights of citizens subject to the laws of the interested government entities. *Cf. Chem. Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1490 (10th Cir. 1997) (stating that statutes are not to be construed in a manner that would lead to an irrational result). Therefore, because of the parties involved and the subject matter of an agreement under § 2804, we cannot accept the State's expansive interpretation of the statute without a clearer indication of congressional intent. *Cf. DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1388 (10th Cir.1990) (declining to imply that Congress intended that a statute be applied

retroactively when Congress chose to remain silent on that issue).

■■■ {14} Moreover, the State's position is not supported under New Mexico law. The State characterizes the verbal agreement between the New Mexico state police and the Mescalero Tribe as an "implicit agreement." The Mutual Aid Act states:

Any state, county or municipal agency having and maintaining peace officers may enter into mutual aid agreements with any public agency as defined in the Mutual Aid Act [29–8–1 NMSA 1978], with respect to law enforcement, provided any such agreement shall be approved by the agency involved and the governor.

Section 29–8–3. Similar to our interpretation of § 2804, we believe that because the Mutual Aid Act addresses governmental agencies and their exercise of law enforcement jurisdiction, the legislature intended that a mutual aid agreement be written. Moreover, by adding the limiting language that mutual aid agreements must be approved by both the agency involved and the governor of the State of New Mexico, we believe that the legislature contemplated a written agreement. Otherwise, there would be too much opportunity for misconstruction. We must be mindful of our duty when interpreting statutes to "find that interpretation which can most fairly be said to be imbedded in the statute in the sense of being most harmonious with its scheme and with the general purpose of the legislature." *Smith Mach. Corp. v. Hesston, Inc.*, 102 N.M. 245, 247, 694 P.2d 501, 503 (1985) (internal quotation marks and citation omitted).

{15} The legislature's intent with regard to the validity of verbal mutual aid agreements can also be discerned from looking to a statute similar to the Mutual Aid Act. *See State v. Ogden* 118 N.M. 234, 243, 880 P.2d 845, 854 (1994) (stating that "[s]tatutes on the same general subject should be construed by reference to each other, the theory being that the court can discern legislative intent behind an unclear statute by reference to similar statutes where legislative intent is more clear") (citation omitted). NMSA 1978, § 29–1–11(B) (2002) governs "cross commissioning"

of peace officers. The statute states in pertinent part:

> The chief of the state police is granted authority to issue commissions as New Mexico peace officers to members of the police or sheriff's department of any New Mexico Indian tribe or pueblo or a law enforcement officer employed by the bureau of Indian affairs to implement the provisions of this section. The procedures to be followed in the issuance and revocation of commissions and the respective rights and responsibilities of the departments shall be set forth in a written agreement to be executed between the chief of the state police and the tribe or pueblo or the appropriate federal official.

*Id.* It is inconsistent for the legislature to require a written agreement for the issuance of a cross commission under Section 29–1–11 between state law enforcement and Indian tribal police officers and not require a written agreement for mutual aid agreements under Section 29–8–3. *Cf. State v. Herrera,* 86 N.M. 224, 226, 522 P.2d 76, 78 (1974) ("We will not construe statutes to achieve an absurd result.").

{16} Officer Silva initially stopped Defendant for speeding on the Mescalero Reservation. Because Officer Silva did not have authority to enforce Mescalero tribal traffic ordinances, the district court did not err in granting Defendant's motion to suppress.

*Unpreserved Issue*

{17} The State argues for the first time on appeal that even if there is no agreement authorizing the state police to patrol the Mescalero Reservation, Officer Silva had authority because he was conducting a citizen's arrest. Because the State did not raise this issue below, it was not preserved and we do not consider it. *See State v. Vandenberg,* 2003–NMSC–030, ¶ 52, 134 N.M. 566, 81 P.3d 19 ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." (internal quotation marks and citation omitted)); *State v. Javier M.,* 2001–NMSC–030, ¶ 8, 131 N.M. 1, 33 P.3d 1 (same).

*Conclusion*

{18} The district court did not err in granting Defendant's motion to suppress. Accordingly, we affirm the district court's decision.

{19} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL E. VIGIL, Judges.