## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2010-NMSC-038**

**Filing Date: June 8, 2010**

**Docket No. 31,224**

**STATE OF NEW MEXICO,**

     **Plaintiff-Respondent,**

**v.**

**DAVID HARRISON,**

     **Defendant-Petitioner.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Thomas J. Hynes, District Court Judge**

Hugh W. Dangler, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Petitioner

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Respondent
Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, L.L.P.
Richard W. Hughes
Santa Fe, NM

for Amicus Curiae
Pueblo of Santa Ana

Marcelino R. Gomez
Paul M. Spruhan
Window Rock, AZ

for Amicus Curiae

1

Navajo Nation

**OPINION**

**MAES, Justice.**

**{1}** In this appeal, we must determine whether a state, county, or local peace officer,[1] who is not cross-commissioned with the Bureau of Indian Affairs (BIA) or an Indian nation, tribe, or pueblo, *see* NMSA 1978, § 29-1-11 (2005), has the authority to pursue an Indian into Indian country to investigate an off-reservation crime committed in the officer's presence. We conclude that state officers have the authority to enter Indian country to investigate off-reservation crimes committed by Indians, so long as their investigation does not infringe on tribal sovereignty by circumventing or contravening a governing tribal procedure. Because the state officer's investigation in this case did not circumvent or contravene any governing tribal procedures codified in the Navajo Nation Code, we affirm the conviction of David Harrison (Defendant) for driving while intoxicated (DWI) in violation of NMSA 1978, Section 66-8-102 (1953, as amended through 2005).

**I.      FACTS AND PROCEDURAL HISTORY**

**{2}** On August 31, 2005, at approximately 10:30 a.m., Emerson T. Charley, Jr., a deputy with the San Juan County Sheriff's Office, was on patrol duty on County Road 6675 in San Juan County, New Mexico. Deputy Charley was driving east on the county road when he noticed a westbound vehicle traveling at a high rate of speed. Using his radar, Deputy Charley determined that the vehicle was traveling fifty-six miles per hour in a thirty-five miles per hour zone. Deputy Charley engaged the emergency lights on his patrol car, turned around, and followed the vehicle "to let the driver know that [he] was actually going to try to stop him." After the vehicle failed to yield, Deputy Charley activated and changed the tone of his siren to get the driver's attention. However, the vehicle continued driving westbound, crossing a bridge that separates San Juan County from the Navajo Reservation. While crossing the bridge, Deputy Charley observed a large clear bottle containing yellow liquid being tossed out of the passenger side window. The vehicle finally stopped one-third of a mile into the Navajo Reservation.

**{3}** Deputy Charley approached the vehicle and noticed that the driver, Defendant, had blood-shot, watery eyes and smelled moderately of alcoholic beverage. Deputy Charley asked Defendant what he had thrown out of the passenger side window, and Defendant responded that it was a bottle of Budweiser. At this point, Deputy Charley asked Defendant to exit the vehicle and perform a series of field sobriety tests. First, Defendant performed the walk and turn test, during which Deputy Charley observed two clues of

_____

[1]For ease of reference, we hereinafter refer collectively to state, county, and local peace officers as "state officers."

impairment—Defendant miscounted and used his arms for balance. Second, Defendant performed the one-legged stand test, during which Deputy Charley again observed two clues of impairment—Defendant miscounted and dropped his foot three times. On the basis of his training and experience as a patrol officer, Deputy Charley determined that Defendant had been driving while intoxicated.

**{4}** At some point during the stop, Deputy Charley learned that Defendant was a member of the Navajo Nation. Deputy Charley knew that he had no authority to arrest a Navajo Nation member on the Navajo Reservation, so he contacted the Navajo Police Department for assistance. However, the Navajo Police Department was unable to provide assistance, and Deputy Charley testified that "the only thing [he] could do was have [Defendant] try to find a ride. [Defendant] attempted to make a phone call, wasn't able to find somebody, and he decided he was going to walk back to some family's residence."

**{5}** Deputy Charley subsequently secured an arrest warrant, which was executed in compliance with Navajo Nation Code requirements. Defendant was charged by criminal complaint in state court with a fourth or subsequent offense of DWI contrary to Section 66-8-102. Following a jury trial, Defendant was convicted of DWI and sentenced to three years of imprisonment.

**{6}** Defendant appealed from the judgment of the trial court to the Court of Appeals, claiming that "the evidence of his performance on field sobriety tests should have been suppressed because they were administered by a state police officer who is not cross-commissioned with the Bureau of Indian Affairs (BIA) or the Navajo Nation, Defendant is Navajo, and the tests were administered following a stop on the Navajo Nation." *State v. Harrison*, 2008-NMCA-107, ¶ 1, 144 N.M. 651, 190 P.3d 1146. The Court of Appeals acknowledged that Deputy Charley lacked the authority to arrest Defendant on the Navajo Reservation, but nonetheless concluded that he "had authority to stop Defendant on the Navajo Reservation to investigate the traffic offense he observed off the Navajo Reservation and to determine if Defendant was a member of the Navajo Nation." *Id.* ¶¶ 8, 11; *see United States v. Patch*, 114 F.3d 131, 133-34 (9th Cir. 1997). The Court further concluded that the field sobriety tests did not violate the Fourth Amendment to the United States Constitution because Defendant performed the tests voluntarily. *Harrison*, 2008-NMCA-107, ¶ 14. Accordingly, the Court held that Defendant's jurisdictional claim was moot and affirmed Defendant's conviction and sentence. *Id.* ¶¶ 14, 16.

**{7}** We granted Defendant's petition for writ of certiorari pursuant to NMSA 1978, Section 34-5-14(B) (1972) and Rule 12-502 NMRA to determine whether a state officer, who is not cross-commissioned with the BIA or the Navajo Nation, has the authority to enter the Navajo Reservation and investigate an off-reservation crime committed by a member of the Navajo Nation. *State v. Harrison*, 2008-NMCERT-008, 145 N.M. 255, 195 P.3d 1267.

## II. DISCUSSION

3

**{8}** Defendant committed the crime of DWI on both state and tribal land. However, Deputy Charley acquired the evidence supporting Defendant's DWI conviction from a traffic stop and investigation conducted exclusively in Indian country.[2] Defendant and Amici Curiae, the Navajo Nation and the Pueblo of Santa Ana, concede that Deputy Charley had the authority to stop Defendant in Indian country and detain him pending the arrival of the Navajo police. However, they argue that Deputy Charley exceeded the scope of his authority by conducting a brief criminal investigation in Indian country, which included the administration of field sobriety tests. Additionally, the Pueblo of Santa Ana claims that Deputy Charley's administration of field sobriety tests constituted a de facto arrest, which violated tribal sovereignty under New Mexico law.

**{9}** The authority of state officers to investigate off-reservation crimes in Indian country is a question of law, which we review de novo. *See State v. Ochoa*, 2008-NMSC-023, ¶ 10, 143 N.M. 749, 182 P.3d 130 (2008) ("The application and interpretation of law is subject to a de novo review."). Although our state judiciary has addressed this issue before, our analysis is also guided by federal law, because "the laws of the United States 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby. . . .'" *State v. Romero*, 2006-NMSC-039, ¶ 7, 140 N.M. 299, 142 P.3d 887 (quoting U.S. Const. art. VI, cl. 2); *see also Cohen's Handbook of Federal Indian Law* § 5.01[1] (Nell Jessup Newton ed. 2005) ("The supremacy clause ensures that laws regulating Indian affairs and treaties with tribes supersede conflicting state laws or state constitutional provisions.").

## A.    Preservation

**{10}** "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ." Rule 12-216(A) NMRA. "Matters outside the record present no issue for review." *State v. Smith*, 92 N.M. 533, 536, 591 P.2d 664, 667 (1979). As the appellant, it is Defendant's burden to provide this Court with a brief statement "explaining how the issue [on appeal] was preserved in the court below, with citations to authorities, record proper, transcript of proceedings or exhibits relied on." Rule 12-213(A)(4) NMRA. "When an issue is not preserved in this manner, our review generally is limited to consideration of jurisdictional questions, issues of general public interest, or matters involving fundamental error or fundamental rights of a party." *State v. Foster*, 1999-NMSC-007, ¶ 47, 126 N.M. 646, 974 P.2d 140; *see also* Rule 12-216(B).

**{11}** Defendant's brief-in-chief fails to include the requisite statement regarding preservation. However, the trial transcript reveals that, at the beginning of the trial, Defendant requested and received a continuing objection on his "Motion to Suppress Evidence based on the fact that [Defendant] was pulled over on the reservation." The record proper and trial transcript contain no further information regarding Defendant's suppression

---

[2]It is undisputed that the Navajo Nation satisfies the statutory definition of "Indian country" set forth in 18 U.S.C. § 1151 (2006).

4

motion or the trial court's ruling. Thus, on the record before us, we do not know what evidence Defendant sought to suppress, the basis for the trial court's ruling, or whether the challenged evidence ultimately was presented to the jury. In the absence of such information, we are compelled to conclude that Defendant's claim was not preserved for appellate review.

**{12}** Nonetheless, we exercise our discretion under Rule 12-216(B) "to consider an issue not preserved below under the general public interest exception." *State v. Pacheco*, 2007-NMSC-009, ¶ 11, 141 N.M. 340, 155 P.3d 745. "Although this exception should be used sparingly," *id.*, we do so in this case because of the important public interest in defining the state's authority to pursue an Indian into Indian country to investigate off-reservation crimes. In the absence of guidance from this Court, state officers run the risk of infringing on tribal sovereignty, a result which cannot be sanctioned. *Farmington v. Benally* (*Benally II*), 119 N.M. 496, 499, 892 P.2d 629, 632 (Ct. App. 1995). Accordingly, we review the merits of Defendant's claim on appeal.

## B.      State Criminal Jurisdiction in Indian Country

**{13}** "As a general principle, a state does not have jurisdiction over crimes committed by an Indian in Indian country." *State v. Frank*, 2002-NMSC-026, ¶ 12, 132 N.M. 544, 52 P.3d 404. However, a state generally has jurisdiction over crimes committed by an Indian off the reservation. *See State v. Quintana*, 2008-NMSC-012, ¶ 9, 143 N.M. 535, 178 P.3d 820; *Blatchford v. Gonzales*, 100 N.M. 333, 339, 670 P.2d 944, 950 (1983); *see also Kake v. Egan*, 369 U.S. 60, 75 (1962) ("It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country."). When a crime occurs both inside and outside of Indian country, state courts acquire concurrent jurisdiction with tribal and federal courts. *See State v. Clark*, 2000-NMCA-052, ¶ 5, 129 N.M. 194, 3 P.3d 689 ("New Mexico has historically held that it . . . has jurisdiction over crimes that [begin in Indian country and] continue into State territory."); *Cohen's*, *supra*, § 9.06 ("Most courts addressing this issue have concluded that when a crime occurs both inside and outside of Indian country, state courts acquire concurrent jurisdiction over the crimes that occurred at least partially within the state's territorial jurisdiction.").

**{14}** Although a state lacks jurisdiction over crimes committed by *Indians* in Indian country, a state has limited jurisdiction over crimes committed by *non-Indians* in Indian country. Specifically, a state has jurisdiction over "crimes by non-Indians against non-Indians . . . and victimless crimes by non-Indians." *Solem v. Bartlett*, 465 U.S. 463, 465 n.2 (1984) (citation omitted); *see also Draper v. United States*, 164 U.S. 240, 245 (1896) (holding that the states have exclusive jurisdiction over the murder of a non-Indian by a non-Indian in Indian country); *United States v. McBratney*, 104 U.S. 621, 624 (1881) (same). Because most traffic offenses are victimless crimes, "in which neither an Indian nor Indian property is involved," the states have subject matter jurisdiction to adjudicate these offenses in state court. *Cohen's*, *supra*, § 9.03[1]; *see also State v. Warner*, 71 N.M. 418, 421-22, 379 P.2d 66, 68-69 (1963) (holding that DWI is a victimless crime and, therefore, the state had

5

jurisdiction to arrest and prosecute a non-Indian defendant who committed the offense of DWI in Indian country). *But see State v. Branham*, 2004-NMCA-131, ¶¶ 2, 16, 136 N.M. 579, 102 P.3d 646 (holding that a state police officer had no authority to arrest and charge the non-Indian defendant with the crimes of DWI, driving with a suspended or revoked license, resisting, evading or obstructing an officer, and speeding because those crimes were committed in Indian country).

**1.      State Officer's Authority to Stop a Vehicle in Indian Country**

**{15}**     We are not bound by Defendant's and Amici Curiae's concession regarding Deputy Charley's authority to stop Defendant's vehicle in Indian country. *Foster*, 1999-NMSC-007, ¶ 25.  Accordingly, we take this opportunity to examine a state officer's authority to stop a vehicle in Indian country for a traffic violation committed in the officer's presence.

**{16}**     We find the Ninth Circuit Court of Appeals' opinion in *Patch* to be instructive.  The defendant in *Patch* was Indian, and "[a]ll material acts, including the alleged traffic violation, took place in Indian country."  114 F.3d at 132.  The state police officer pursued the defendant's vehicle to determine "whether the driver was a tribal member, whom [the officer] had no authority to arrest, or a nonmember, whom he could arrest for traffic violations on a state highway."  *Id.* at 132-33.  The defendant refused to stop, but drove to his sister's house, where a physical altercation between the defendant and the officer ensued.  *Id.* at 133.  As a result, the defendant was charged with simple assault in violation of 18 U.S.C. § 113(a)(5) (1994).  On appeal, the defendant claimed that the state police officer had no authority to pursue and stop his vehicle in Indian country.  *Patch*, 114 F.3d at 134.

**{17}**     The Ninth Circuit Court of Appeals noted that, "[a]s a practical matter, without a stop and inquiry, it is impossible for [a state] officer to tell who is operating an offending vehicle."  *Id.* at 133-34.  The Court held that such a stop and inquiry is a logical application of *Terry v. Ohio*, 392 U.S. 1 (1968), because the state officer

> needed to make only a brief stop to ascertain [the defendant's] identity.  Such a stop would be a brief, limited detention to ask one question.  Like the stop in *Terry*, its purpose would further a legitimate law enforcement objective: to determine whether the suspect was a tribal member.  [The state officer] had the authority under *Terry* to stop vehicles . . . to determine his jurisdiction to issue a citation.

*Patch*, 114 F.3d at 134.; *cf. State v. Schmuck*, 850 P.2d 1332, 1335 (Wash. 1993) (en banc) (holding that tribal sovereignty "necessarily includes the authority to stop a driver on the reservation to investigate a possible violation of tribal law and determine if the driver is an Indian, subject to the jurisdiction of that law").

**{18}**     We agree with the conclusion of the Ninth Circuit Court of Appeals that a state officer has the authority to stop an offending vehicle in Indian country to determine whether

6

the officer has jurisdiction to investigate and enforce violations of the traffic code. *Patch*, 114 F.3d at 134. In this case, Deputy Charley observed Defendant speeding off-reservation and throwing a clear bottle of yellow liquid out the passenger side window of his vehicle. Accordingly, Deputy Charley had the authority to stop Defendant's vehicle on the Navajo Reservation to determine the scope of his authority to investigate the off-reservation traffic offenses committed in his presence.

2. **Scope of a State Officer's Authority to Investigate in Indian Country an Off-Reservation Traffic Offense Committed by an Indian**

**{19}** Having determined that Deputy Charley had the authority to stop Defendant's vehicle in Indian country, we next address the scope of Deputy Charley's authority to investigate the off-reservation traffic offenses committed in his presence. The scope of a state officer's investigative authority in Indian country necessarily is dependent on the scope of the state's criminal jurisdiction, which, in turn, is dependent on two factors: (1) whether the defendant is Indian or non-Indian, and (2) whether the traffic violation occurred inside or outside of Indian country. *See Cohen's*, *supra*, § 9.07 ("The investigative authority of officers is . . . generally limited to the criminal jurisdiction of their government."). If the defendant is *non-Indian* and the traffic offense was victimless in nature, then the state officer has full authority to conduct a complete criminal investigation, regardless of whether the violation occurred *inside or outside* of Indian country. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212 (1978) ("Indian tribes do not have inherent jurisdiction to try and to punish non-Indians."), *superseded in part by statute on other grounds as stated in United States v. Lara*, 541 U.S. 193, 205-07 (2004). This is because the state has criminal jurisdiction over crimes committed by non-Indians outside of Indian country and victimless crimes committed by non-Indians inside of Indian country. However, if the defendant is *Indian* and the traffic offense occurred *inside* of Indian country, as in *Patch*, then the state officer's investigative authority is limited to ascertaining the defendant's identity and detaining the defendant pending the arrival of the proper authorities. *See Patch*, 114 F.3d at 134. This is because the state lacks jurisdiction over crimes committed by Indians inside of Indian country.

**{20}** The more complicated question, and the one presented in this case, is the scope of a state officer's authority to investigate traffic offenses committed by an *Indian outside of Indian country*. As previously explained, the state has jurisdiction over off-reservation crimes committed by Indians. However, a state officer's investigative authority in Indian country necessarily is limited by tribal sovereignty; i.e., "the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220 (1959); *see also Nevada v. Hicks*, 533 U.S. 353, 366 (2001) (holding that state jurisdiction to investigate off-reservation crimes in Indian country is not federally preempted, because "[n]othing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation"). To resolve the issue on appeal, we must determine whether Deputy Charley's actions, administering field sobriety tests to an Indian driver in Indian country, violated the tribal sovereignty of the Navajo Nation.

7

**{21}** We begin our analysis with *Benally v. Marcum* (*Benally I*), in which state officers pursued and arrested an Indian driver on the Navajo Nation for off-reservation traffic violations committed in the officers' presence. 89 N.M. 463, 464-66, 553 P.2d 1270, 1271-73 (1976), *holding limited in part by Benally II*, 119 N.M. at 499, 892 P.2d at 632. This Court noted that, under the Navajo Tribal Code, only Navajo police officers had the authority to apprehend an "'Indian [who] has committed a crime outside of Indian Country and is present in the Navajo 'Indian Country' and using it as an asylum from prosecution by the state.'" *Id.* at 464-65, 553 P.2d at 1271-72 (quoting Navajo Tribal Code, tit. 17, § 1001 (1970)). We held that Defendant's arrest violated the tribal sovereignty of the Navajo Nation "because it circumvented and was contrary to the orderly procedure for extradition from the Navajo Reservation provided for in" the Navajo Tribal Code. *Id.* at 464, 553 P.2d at 1271.

**{22}** Our holding in *Benally I* was "based on the existence of a valid procedure for extradition in the Navajo Tribal Code." *Benally II*, 119 N.M. at 498, 892 P.2d at 631; *see also State v. Yazzie*, 108 N.M. 677, 679, 777 P.2d 916, 918 (Ct. App. 1989) ("*Benally* [*I*] held that when an Indian commits a crime off-reservation, and is located on the reservation, tribal extradition procedures must be followed. If they are not, the arrest is illegal."). Where a valid extradition procedure exists, the arrest of an Indian on Indian land is illegal, regardless of whether the state officers are in fresh pursuit, *Benally II*, 119 N.M. at 498, 892 P.2d at 631, or whether the state's "interests are great and a serious crime is involved," *Yazzie*, 108 N.M. at 679, 777 P.2d at 918.

**{23}** Most courts that have addressed a state officer's authority to conduct criminal investigations in Indian country also "have found that a determination of whether such an exercise of state authority infringes on tribal sovereignty turns on the existence of a governing tribal procedure." *State v. Mathews*, 986 P.2d 323, 337 (Idaho 1999)[3]; *see also, e.g.*, *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683, 686 (9th Cir. 1969) (holding that the State of Arizona lacked the authority to extradite the Indian defendant from Indian country because the Navajo Nation has "codified and does now exercise its extradition power. This power cannot now be assumed by or shared with the State of Arizona without 'infring(ing) on the right of reservation Indians to make their own laws and be ruled by them.'" (citation

---

[3]We note that, unlike New Mexico, Idaho has assumed partial criminal jurisdiction over crimes committed by Indians in Indian country pursuant to Public Law 280. 67 Stat. 588 (1953) (permitting states to assume criminal jurisdiction over crimes committed by or against Indians in Indian country, with the consent of the Indian tribe) (codified as amended at 25 U.S.C. § 1321(a) (2006)); Idaho Code Ann. § 67-5101 (1963) (assuming criminal jurisdiction over certain offenses). However, *Mathews* involved the off-reservation crime of murder, and "the State of Idaho . . . did not assume jurisdiction over murder crimes or the execution of state court search warrants within Indian country." 986 P.2d at 334. Accordingly, "the limitations on state criminal jurisdiction over crimes committed within Indian country," were fully applicable to the Idaho Supreme Court's analysis in *Mathews*. *Id.* at 335.

omitted)).  In the absence of a governing tribal procedure, the exercise of state authority to conduct a criminal investigation in Indian country does not infringe on tribal sovereignty because it does not affect the right of Indians to make their own laws and be ruled by them.  *See Mathews*, 986 P.2d at 337 ("We agree with the view that tribal sovereignty is not infringed when a state court issued search warrant is executed within Indian country where the state possesses jurisdiction over the underlying crime and where tribal law does not provide a procedure for executing the warrant within Indian country."); *LeClair v. Powers*, 632 P.2d 370, 375-76 (Okla. 1981) (holding that the service of state process in Indian country did not interfere "with the self-governing activities of the Indian tribe" because it did not violate any governing provision of the tribal code).  *But see State v. Cummings*, 679 N.W.2d 484, 488 (S.D. 2004) (holding that the "State has no jurisdiction to act on the reservations in South Dakota").

{24}     The general consensus among our sister states regarding a state officer's authority to investigate off-reservation crimes in Indian country also is supported by *Hicks*, which held that "[s]tate sovereignty does not end at a reservation's border," because "an Indian reservation is considered part of the territory of the State."  533 U.S. at 361-62 (internal quotation marks and citation omitted).  The Court noted that, although the states lack jurisdiction to implement substantive criminal laws regulating "on-reservation conduct involving only Indians," the states retain jurisdiction to execute state criminal process in Indian country for off-reservation crimes.  *Id.* at 362-63 (internal quotation marks and citation omitted).  The Court broadly defined the term "process" as "'any means used by a court to acquire or exercise its jurisdiction over a person or over specific property.'"  *Id.* at 364 (quoting *Black's Law Dictionary* 1084 (5th ed. 1979)).  The Court reasoned that "the reservation of state authority to serve process is necessary to prevent [such areas] from becoming an asylum for fugitives from justice."  *Id.* (internal quotation marks and citation omitted).  Accordingly, the Court held that

> tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to "the right to make laws and be ruled by them."  The State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government.

*Id.*

{25}     Although the Court's analysis in *Hicks* focused on the execution of a state search warrant, the term "process" is not limited to warrants or summons, but, rather, encompasses all state criminal process or procedure.  *Black's Law Dictionary* 1325 (9th ed. 2004) ("The term process is not limited to summons.  In its broadest sense it is equivalent to, or synonymous with, procedure, or proceeding." (internal quotation marks and citation omitted)).  We conclude that field sobriety tests are procedural, rather than substantive, in

9

nature because they are the investigative method by which the state enforces its substantive law prohibiting DWI. *See State ex rel. Gesswein v. Galvan*, 100 N.M. 769, 770, 676 P.2d 1334, 1335 (1984) ("It is well settled that a substantive law creates, defines, or regulates rights while procedural law outlines the means for enforcing those rights and obtaining redress."). Accordingly, pursuant to *Hicks*, Deputy Charley had the authority "to enter a reservation (including Indian-fee lands) for enforcement purposes." *Hicks*, 533 U.S. at 363.

**{26}** Defendant and Amicus Curiae Santa Ana Pueblo claim that our reliance on *Hicks* is misplaced because the above quoted language constitutes non-binding dicta. Specifically, they claim that the United States Supreme Court's analysis was joined by only two other justices and was not necessary to the opinion's holding. We disagree. First, the opinion of the Court was delivered by Justice Scalia and joined by five other Justices—Chief Justice Rehnquist and Justices Ginsburg, Kennedy, Souter, and Thomas. *Id.* at 354. Thus, a majority of the Court joined the analysis regarding state authority to investigate off-reservation crimes committed by Indians in Indian country. Second, although *Hicks* involved *"tribal court . . . jurisdiction* over *civil claims* against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation," the Court's analysis of *state criminal investigative jurisdiction* was essential to its holding. *Id.* at 355 (emphasis added). The Court held that the tribal court lacked jurisdiction to adjudicate the Indian plaintiff's civil claim because the tribe lacked jurisdiction to regulate the execution of state criminal process in Indian country for off-reservation crimes. *Id.* at 357-65. Accordingly, we reject Defendant's and Amicus Curiae's claim that *Hicks* is inapplicable to this case.

**{27}** We recognize that the United States Supreme Court's holding in *Hicks* could be construed broadly to suggest that state officers who are investigating off-reservation crimes in Indian country need not comply with governing tribal procedures. However, New Mexico has a unique and venerable tradition of deferring to a "[t]ribal government's exercise of the sovereign power vested in them." *Benally I*, 89 N.M. at 467, 553 P.2d at 1274; *see State v. Nysus*, 2001-NMCA-023, ¶ 5, 130 N.M. 431, 25 P.3d 270 (noting that "the holding in *Benally I* has been limited by New Mexico case law to apply only to Native Americans illegally arrested on Indian land because of the unique circumstances of tribal sovereignty"); *cf. Garcia v. Gutierrez*, 2009-NMSC-044, ¶ 65, 147 N.M. 105, 217 P.3d 591 ("Our state has a long and laudable tradition of comity between state and tribal courts . . . ."). In light of this tradition, we conclude that the courts of this state have adopted greater protection for tribal sovereignty as a matter of state law. *See State v. Javier M.*, 2001-NMSC-030, ¶ 24, 131 N.M. 1, 33 P.3d 1 ("[W]hile the federal constitution provides a minimum level of protection below which the states may not descend, states remain free to provide greater protection." (internal quotation marks and citation omitted)); *Cohen's*, *supra*, § 9.07 (noting that "nothing in *Hicks* prevents a state from cooperating with tribal governments by requiring its officials to seek tribal court warrants before conducting searches on tribal land").

**{28}** The Navajo Nation does not have a tribal procedure governing the administration of field sobriety tests. In the absence of such a codified procedure, we cannot conclude that

10

Deputy Charley's actions infringed on the right of the Navajo Nation to make its own laws and be ruled by them. As the Court of Appeals correctly observed,

> Officer Charley scrupulously respected Navajo Nation sovereignty. Officer Charley recognized the limits of his authority and did not arrest Defendant. After concluding that Defendant was driving while intoxicated, Officer Charley was faced with a predicament because he recognized he had no authority to arrest Defendant and because no Navajo police officers were available. Rather than allowing a suspected drunk driver to get back into his vehicle and possibly injure or kill people, Officer Charley allowed Defendant the opportunity to try getting someone else to give him a ride. Learning that no ride was available, Officer Charley allowed Defendant to leave the scene walking. There was no injury to the sovereignty of the Navajo Nation.

*Harrison*, 2008-NMCA-107, ¶ 15.

**{29}** In its amicus curiae brief, the Navajo Nation indicates that it is willing to enter into a cross-commission agreement with San Juan County. If such an agreement had existed in this case, then there would be no grounds for this appeal: Deputy Charley would have had legal authority to pursue Defendant into the Navajo Nation, conduct the field investigation, and arrest Defendant in full compliance with the sovereignty of the Navajo Nation. Cross-commission agreements are consistent with this State's venerable tradition of cooperation and comity between state and tribal governments, and we encourage San Juan County to enter into a such an agreement with the Navajo Nation in order to protect the citizens of this State, who reside both on and off the reservation, from the danger of DWI, a problem which transcends borders.

**C.        Whether Defendant's Detention Ripened into a De Facto Arrest**

**{30}** Lastly, Defendant and Amicus Curiae Santa Ana Pueblo claim that Deputy Charley's detention of Defendant exceeded the bounds of a permissible traffic stop and ripened into a de facto arrest. They argue that this de facto arrest infringed on the sovereignty of the Navajo Nation because it violated the tribe's governing extradition procedures.

**{31}** Under the Fourth Amendment to the United States Constitution, "'police officers may stop a person for investigative purposes where, considering the totality of the circumstances, the officers have a reasonable and objective basis for suspecting that particular person is engaged in criminal activity.'" *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994) (quoting *United States v. Williams*, 962 F.2d 1218, 1223 (6th Cir. 1992)). "An officer who makes a valid investigatory stop may briefly detain those he suspects of criminal activity to verify or quell that suspicion." *Id*.

> New Mexico courts follow the two-part test set forth in *Terry* to analyze the reasonableness of an officer's actions during a traffic stop. *State v. Duran*,

11

2005-NMSC-034, ¶ 23, 138 N.M. 414, 120 P.3d 836.  Under *Terry*, "the officer's action [must have been] justified at its inception, and . . . it [must have been] reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868; *accord Duran*, 2005-NMSC-034, ¶ 23, 138 N.M. 414, 120 P.3d 836.

*State v. Funderburg*, 2008-NMSC-026, ¶ 13, 144 N.M. 37, 183 P.3d 922.  "A court should consider both the length of the detention and the manner in which it is carried out when determining whether a lawfully-initiated investigatory detention has become unlawfully extended." *State v. Sewell*, 2009-NMSC-033, ¶ 17, 146 N.M. 428, 211 P.3d 885; *see also Funderburg*, 2008-NMSC-026, ¶ 16 ("An officer's continued detention of a suspect may be reasonable if the detention represents a graduated response to the evolving circumstances of the situation.").

**{32}**     Deputy Charley initiated the traffic stop in this case, because he observed Defendant speeding and throwing a clear bottle of yellow liquid from his vehicle.  After stopping Defendant, Deputy Charley noticed that Defendant had blood-shot, watery eyes and smelled moderately of alcohol.  In response to questioning, Defendant admitted that the discarded bottle contained alcohol.  Deputy Charley suspected that Defendant had been driving while intoxicated and, therefore, administered a series of field sobriety tests.  Based upon Defendant's performance on these tests, Deputy Charley determined that Defendant was impaired by alcohol to the slightest degree.  Defendant was free to, and indeed did, leave the scene of the investigation by walking to the home of a nearby relative.  Deputy Charley subsequently secured a warrant for Defendant's arrest, which was executed in compliance with Navajo Nation Code procedures.

**{33}**     It is undisputed that Deputy Charley had a reasonable and objective basis for suspecting Defendant of criminal activity and, therefore, that the initial stop of Defendant's vehicle was lawful.  Although Defendant and Amicus Curiae Santa Ana Pueblo allege that the length and manner of Defendant's detention exceeded that which was necessary for Deputy Charley to quell or verify his initial suspicion of criminal activity, there is no evidence in the record to support this allegation. *See State v. Williamson*, 2000-NMCA-068, ¶¶ 5-16, 129 N.M. 387, 9 P.3d 70 (holding that the defendant was not under de facto arrest during a routine traffic stop, despite a brief detention following the administration of field sobriety tests); *Armijo v. State Transp. Dep't*, 105 N.M. 771, 773, 737 P.2d 552, 554 (Ct. App. 1987) (holding that the defendant was not under de facto arrest during a routine traffic stop, even though he was "asked to repeat the field sobriety tests and answer questions posed by [a] second officer").  We therefore reject Defendant's claim that his detention ripened into a de facto arrest, which infringed on the sovereignty of the Navajo Nation.

## III.   CONCLUSION

**{34}**     We conclude that state officers have the authority to enter Indian country to investigate off-reservation crimes committed in their presence by Indians, so long as the

12

investigation does not infringe on tribal sovereignty by circumventing or contravening a governing tribal procedure.  The traffic stop in this case, which included the administration of field sobriety tests, did not circumvent or contravene the Navajo Nation Code and, therefore, did not infringe on the sovereignty of the Navajo Nation.  Accordingly, we affirm Defendant's DWI conviction.

{35}    IT IS SO ORDERED.

_____
**PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Harrison*, Docket No. 31,224**

| **AE** | **APPEAL AND ERROR** |
|---|---|
| AE-PA | Preservation of Issues for Appeal |

| **CL** | **CRIMINAL LAW** |
|---|---|
| CL-DG | Driving While Intoxicated |

| **CA** | **CRIMINAL PROCEDURE** |
|---|---|
| CA-AT | Arrest |
| CA-DN | Detention or Custody |

| **IL** | **INDIAN LAW** |
|---|---|
| IL-IG | Indian Law, General |
| IL-TJ | Tribal and State Authority and Jurisdiction |