This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                                        **NO. 32,088**

**CARL WISELEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF UNION COUNTY**
**John M. Paternoster, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Ralph E. Trujillo, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**VANZI, Judge.**

{1}     Defendant appeals his convictions for three counts of aggravated assault. Defendant makes five arguments on appeal. Defendant first argues that fundamental error occurred because the jury instructions did not adequately reflect the requirements of the aggravated assault statute. Second, Defendant contends that his multiple convictions for aggravated assault against three victims constitute double jeopardy. Defendant also argues that the State presented insufficient evidence to support the jury's verdict on the aggravated assault charges as to each of the three victims and as to whether the broken glass Defendant used could be considered a deadly weapon. In addition, Defendant asserts that his rights to a fair and impartial jury and a unanimous verdict were violated when the jury was permitted to return its verdict without a juror's question being answered. Finally, Defendant argues that his right to an impartial jury was violated when a juror interrupted the proceedings to notify the district court of its verdict. We affirm.

**BACKGROUND**

{2}     This case stems from a conflict between Chance Hall (Mr. Hall), the owner of an RV park, Mr. Hall's teenage sons, Luke and Jacob (collectively, the Halls), and Defendant, a neighbor of the RV park, over Defendant's multiple entries onto the RV park against Mr. Hall's wishes. After a series of run-ins between Defendant and Mr. Hall, an altercation ensued that led to Defendant's convictions for three counts of aggravated assault against each of the Halls. The following is a brief overview of the

events that unfolded on the day of the incident. Additional facts are provided as pertinent to our discussion of the issues.

{3}     After several times in a single day that Mr. Hall saw Defendant on his property, Mr. Hall confronted Defendant and told him to leave. Defendant, who was filling up two gallon-sized glass jugs with water from the RV Park, got angry and began to argue with Mr. Hall. Luke Hall, one of Mr. Hall's sons, also approached close to Defendant. Defendant told Luke to stop staring at him and threatened to "whip [his] ass." Richard Martinez, another resident of the RV park and a relative of Defendant, intervened, and initially appeared to cool the situation. At some point, Jacob Hall, Mr. Hall's other son, also approached Defendant, carrying by his side an ax handle from a nearby scrap pile.

{4}     The altercation escalated when Defendant dropped or threw the two glass jugs onto the ground. One of them broke into pieces. Defendant picked up several pieces of broken glass in one hand, and at least one larger piece of glass in his other hand. Defendant proceeded to hold the glass at shoulder height and wave the broken glass in a menacing manner while directing insults and threats at the group as a whole, as well as at each member of the group, and telling the Halls he was going to "whip every one of [their] asses." Each of the Halls testified to feeling threatened and fearing that Defendant was going to hurt them individually and testified as to specific threats and actions that were directed toward each of them during the course of the

3

altercation. After a period of time, Defendant ultimately returned to his residence without harming anyone, and the Halls contacted the police.

{5} Defendant was arrested and initially charged by criminal complaint with one count of aggravated assault for unlawfully threatening Mr. Hall. The State subsequently amended the complaint to charge Defendant with three counts of aggravated assault for unlawfully threatening Mr. Hall, Luke, and Jacob. After being bound-over on the charges, a criminal information was filed in the district court, charging Defendant with three counts of aggravated assault (deadly weapon) contrary to NMSA 1978, § 30-3-2(A) (1963). The case went to jury trial, and Defendant was convicted on all three counts of aggravated assault as to each of the Halls. Following Defendant's conviction, the State filed a supplemental information. Before his sentencing hearing, Defendant filed a sentencing memorandum to merge the three aggravated assault convictions into one, asserting that the multiple convictions subjected him to double jeopardy. The court denied the motion. With habitual offender enhancements tacked onto each of the convictions, Defendant was sentenced to a total period of incarceration of eight years and six months. This appeal timely followed.

**DISCUSSION**

**Erroneous Jury Instruction**

4

**{6}** Defendant first contends that fundamental error occurred at trial because the jury instructions did not adequately reflect the requirements of the aggravated assault statute. Defendant argues that the jury instructions did not "create the requisite nexus between [D]efendant's acts and the object of those acts." Defendant also asserts that the jury instructions failed to adequately convey the requirement that the broken glass was being used as a deadly weapon under the facts of this case.

**{7}** Where, as here, a party did not object at trial to the jury instructions as they were given, we review for fundamental error. *See State v. Cunningham*, 2000-NMSC-009, ¶ 8, 128 N.M. 711, 998 P.2d 176. "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Sutphin*, 2007-NMSC-045, ¶ 16, 142 N.M. 191, 164 P.3d 72 (internal quotation marks and citation omitted). With this standard in mind, "[w]hen reviewing a jury instruction for fundamental error, we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Arrendondo*, 2012-NMSC-013, ¶ 21, 278 P.3d 517 (internal quotation marks and citation omitted). "An instruction that, through omission or misstatement, gives the juror an inaccurate rendition of the relevant law, may confuse or misdirect a juror." *Id.*

**A.    Threat of Harm to a Particular Person**

5

{8}     Defendant contends that, "based upon the instructions in this case, the jury could have relied upon [Defendant's] assault of Jacob to convict him of assaulting Jacob, [Mr. Hall], and/or [Luke]." Defendant argues that if the jury relied upon the same conduct directed at the same person to convict Defendant of all of the assaults against the various victims, it violated his protections against double jeopardy. Because of the purported uncertainty in the instructions and its consequences, Defendant claims that fundamental error occurred.

{9}     Defendant is correct that when jury instructions allow for conviction on alternative theories and one of those theories would violate double jeopardy, the instructions violate double jeopardy, and a conviction cannot be upheld. *See State v. Foster*, 1999-NMSC-007, ¶ 27, 126 N.M. 646, 974 P.2d 140 (holding that a general verdict cannot be upheld if one of the alternative theories of conviction subjects a defendant to double jeopardy), *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, 148 N.M. 381, 237 P.3d 683. Similarly, even where the facts demonstrated that Defendant's conduct could be divided into distinct acts, if the jury could not tell from the instructions which act (or acts) formed the basis of each charge, an instruction can be erroneous. *See State v. Cook*, 2006-NMCA-110, ¶ 17, 140 N.M. 356, 142 P.3d 944.

{10}     In this case, the district court gave the jury three separate instructions on aggravated assault, which correlate to each of the three victims—Mr. Hall, Jacob, and

6

Luke—as contained in each count of the indictment. Mirroring the Uniform Jury Instruction on aggravated assault with a deadly weapon as contained in UJI 14-305 NMRA, the jury was instructed as follows:

> For you to find [D]efendant guilty of aggravated assault by use of a deadly weapon, as charged in *count 1*, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [D]efendant broke a glass bottle, and while holding the broken glass, threatened harm to another;
>
> 2. [D]efendant's conduct caused [*Mr.*] *Hall* to believe [D]efendant was about to intrude on [*Mr.*] *Hall's* bodily integrity or personal safety by touching or applying force to [*Mr.*] *Hall* in a rude, insolent or angry manner;
>
> 3. A reasonable person in the same circumstance as [*Mr.*] *Hall* would have had the same belief;
>
> 4. [D]efendant used a deadly weapon. [D]efendant used broke[n] glass. Broken [g]lass is a deadly weapon only if you find that a broken glass, when used as a weapon, could cause death or great bodily harm;
>
> 5. This happened in New Mexico on or about the 28th of May, 2010.

Two other versions of this instruction were also given that were identical except for that they substituted the appropriate numbered count of the indictment, as well as Jacob's and Luke's names, according to which victim the applicable count referred.

{11} Defendant argues that although the instructions may have sufficed if he was charged with assaulting only one person, they were not adequate to address

7

Defendant's conduct in the context of him threatening a group of people. Defendant cites to *Cook* to argue essentially that "the absence of a factual basis for each charge in the written instructions . . . could have resulted in the jury convicting Defendant of the same crime twice for a unitary course of conduct." 2006-NMCA-110, ¶ 19. In *Cook*, we held that "although the language of the jury instructions followed the language of [the applicable Uniform Jury Instruction], because the instructions differed only insofar as they incorporated by reference the language of two separate but identical counts from the indictment, they did not make clear to the jury which conduct it should consider to support each charge." *Id.*

{12}     Similarly, here Defendant argues that the jury instructions do not specify which conduct pertains to which victim, and that consequently there is no way to know whether the conviction for each victim is based on Defendant's conduct directed against that individual victim, or whether it is based on Defendant's conduct directed against another victim or against the group generally. Defendant overlooks however that a separate jury instruction was given for each victim that specifically named each victim. Further, in addition to requiring that the jury find Defendant had threatened harm to "another," each instruction also required that the jury single out each victim and separately find that each victim reasonably believe that Defendant was about to intrude on his bodily integrity. Based on these instructions, all the jury had to do was

consider the evidence that pertained to each victim and match it to the applicable instruction naming that victim.

{13} In addition, the possibility that Defendant was convicted on an unconstitutional alternative basis, as contained in *Cook*, is mitigated by the fact that there was no general verdict form entered in this case; rather, the jury entered a separate verdict form for each of the three counts of aggravated assault against each of the three victims, thereby making clear its intent to punish Defendant for each count of aggravated assault against Mr. Hall, Jacob, and Luke, respectively. We do not see how the jury instructions could have confused a rational juror about the conduct that would lead to a conviction from Defendant's conduct toward each individual victim. *See State v. Montoya*, 2011-NMCA-074, ¶ 43, 150 N.M. 415, 259 P.3d 820 (observing that the state can avoid double jeopardy problems by identifying specific, non-unitary conduct in the jury instructions).

{14} Defendant's reliance on *Arrendondo* is also misplaced. In that multiple-victim case, the defendant was convicted of first degree murder, assault with intent to commit a violent felony, and several other offenses for shooting and killing the decedent inside a house where there were multiple other people present, including the decedent's daughter. 2012-NMSC-013, ¶¶ 1-2. With regard to the assault with intent to commit a violent felony charge against the daughter, the jury was instructed that "in addition to the other elements, it had to find that [the defendant] intended to kill [the

9

daughter] or *any other person* or commit murder or mayhem on [the daughter] *or any other person*." *Id.* ¶ 18. Our Supreme Court concluded that the jury instruction on assault with intent to commit a violent felony constituted fundamental error when the jury may have found the defendant guilty of that crime without finding specifically that the defendant intended to murder the daughter. *Id.* ¶ 21. Our Supreme Court reasoned that because "an essential element of the crime of assault with the intent to commit a violent felony is the intent to commit the violent felony *against such person*[,]" if the jury found the defendant "guilty of assaulting [the daughter] because he had the intent to commit a violent felony against [the decedent], but not [the daughter], the jury would have found [the defendant] guilty of a crime that does not exist." *Id.* (emphasis added).

{15}     The jury instructions in this case, on the other hand, could not allow the jury to find Defendant guilty of a crime that does not exist, because aggravated assault is a general intent crime and does not include an intent to do physical harm or bodily injury to a specific person. *See State v. Bachicha*, 1991-NMCA-014, ¶ 10, 111 N.M. 601, 808 P.2d 51 ("Proof of general criminal intent is also a necessary element of the offense of aggravated assault."); *see also State v. Manus*, 1979-NMSC-035, ¶ 14, 93 N.M. 95, 597 P.2d 280 ("The [s]tate was not required to prove that [the defendant] intended to assault [the victim], but only that he did an unlawful act which caused [the victim] to reasonably believe that she was in danger of receiving an immediate battery,

10

that the act was done with a deadly weapon, and that it was done with a general criminal intent."), *overruled on other grounds by Sells v. State*, 1982-NMSC-125, 98 N.M. 786, 653 P.2d 162. Rather, the statute references the effect the alleged perpetrator's actions have on the victims. *See* NMSA 1978, § 30-3-1(B) (1963) (defining assault as "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery"). Therefore, so long as the jury found that Defendant had a general criminal intent when he perpetrated the assaults, it did not need to find that Defendant specifically intended to harm each of the victims. We conclude there was no fundamental error in the jury instructions relative to the various counts of aggravated assault against the three victims.

**B.    Deadly Weapon**

{16}    Defendant next contends that the jury instructions failed to inform the jury that it would need to determine that it was Defendant's manner of using the broken glass in this case that determined whether the broken glass was a deadly weapon. Defendant asserts that the jury was only instructed to consider whether broken glass could be used as a deadly weapon generally and that this was improper. We are not persuaded.

{17}    In defining the term deadly weapon, our Legislature provided a list of items that are considered deadly weapons per se or as a matter of law and included "any other weapons with which dangerous wounds can be inflicted." NMSA 1978, § 30-1-12(B)

11

(1963). "If an instrument or object is not listed, the jury must determine whether the item is a deadly weapon." *State v. Neatherlin*, 2007-NMCA-035, ¶ 11, 141 N.M. 328, 154 P.3d 703. To determine this, "the jury must decide whether the object or instrument is a weapon which is capable of producing death or great bodily harm or a weapon with which dangerous wounds can be inflicted." *Id.* (internal quotation marks and citations omitted). This analysis centers on allowing the jury to decide the issue of whether a particular object or instrument is a deadly weapon. *See id.* ("The question of whether the item is a deadly weapon, given the defendant's use and the character of the item, should be submitted to the jury for a finding of fact." (alteration, internal quotation marks, and citation omitted)).

{18} In this case, the jury was tasked with determining whether Defendant used a deadly weapon when it was given the Uniform Jury Instruction on aggravated assault based on threat or menacing conduct with a deadly weapon. *See* UJI 14-305 NMRA. Pursuant to our mandates regarding the use of uniform jury instructions, the only modification in the tendered instruction was that the name of the instrument or object—"broken glass"—was inserted where applicable. *See State v. Caldwell*, 2008-NMCA-049, ¶ 24, 143 N.M. 792, 182 P.3d 775 ("When a uniform jury instruction exists, that instruction must be used without substantive modification."). In addition to the instruction on whether broken glass was to be considered a deadly weapon, the jury was also instructed that "[D]efendant broke a glass bottle, and while holding the

12

broken glass, threatened harm to another." Viewing the relevant jury instruction as a whole, it is clear that the jury was in fact asked to consider the manner in which Defendant used the glass in making its determination of whether the broken glass could be considered a deadly weapon in this case. *See State v. Reed*, 2005-NMSC-031, ¶ 55, 138 N.M. 365, 120 P.3d 447 (providing that appellate courts consider the claim of error "in the context of jury instructions as a whole"). A rational juror would not be confused or misdirected by the instructions pertaining to a deadly weapon tendered in this case. *See Sutphin*, 2007-NMSC-045, ¶ 19.

**Double Jeopardy**

{19}     Defendant next contends that his three convictions for aggravated assault violate double jeopardy. "Among its protections, the double jeopardy clause protects a defendant against multiple punishments for the same offense." *State v. Gonzales*, 2007-NMSC-059, ¶ 11, 143 N.M. 25, 172 P.3d 162. Double jeopardy presents "a question of law, which we review de novo." *State v. Montoya*, 2013-NMSC-020, ¶ 22, 306 P.3d 426 (internal quotation marks and citation omitted). "We apply a unit-of-prosecution analysis because we are examining multiple convictions under the same statute." *State v. Swick*, 2012-NMSC-018, ¶ 33, 279 P.3d 747.

{20}     In a unit-of-prosecution analysis, "the only question to be answered in determining whether [multiple] charges are the same offense is whether the defendant's conduct underlying each charge was part of the same act or transaction

13

as defined by the [L]egislature." *State v. Gallegos*, 2011-NMSC-027, ¶ 33, 149 N.M. 704, 254 P.3d 655 (internal quotation marks and citation omitted). To this end, "[t]he first question we generally ask is whether the statutory language spells out the unit of prosecution. If the statutory language for [aggravated assault] were clear regarding the unit of prosecution, then the language would control, and the analysis would be complete." *Id.* ¶ 51 (alterations, internal quotation marks, and citations omitted). "If the statutory language is not clear, we must then determine whether the defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *State v. Garcia*, 2009-NMCA-107, ¶ 8, 147 N.M. 150, 217 P.3d 1048. Under what is often referred to as the *Herron* analysis, we consider indicia of distinctness by looking at "(1) temporal proximity of the acts; (2) location of the victim during each act; (3) existence of an intervening act; (4) sequencing of the acts; (5) the defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *Id.* ¶ 10. Our Supreme Court highlights that in the *Herron* analysis, "[t]he number of victims has been a particularly significant indicator in determining whether acts are distinct." *State v. Bernal*, 2006-NMSC-050, ¶ 18, 140 N.M. 644, 146 P.3d 289. "While the existence of multiple victims does not, itself, settle whether conduct is unitary or distinct, it is a strong indicator of legislative intent to punish distinct conduct that can only be overcome by other factors." *Id.*

14

{21} Our statutes define aggravated assault with a deadly weapon, in relevant part, as "unlawfully assaulting or striking at another with a deadly weapon[.]" Section 30-3-2(A). Assault, in turn, is defined in relevant part as "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[.]" Section 30-3-1(B). We note initially that the assault statute appears to evince a legislative intent to punish each act affecting each victim because the focus of the statute's language is on the effect of the defendant's actions on the victim, and not simply on those actions themselves. Moreover, we have previously analyzed the appropriate unit of prosecution in a multiple-victim assault case in *State v. Roper*, 2001-NMCA-093, 131 N.M. 189, 34 P.3d 133. In *Roper*, we emphasized that the interest protected by the assault statute is the protection of a victim from the mental harm caused by the threat of violence. *Id.* ¶ 12. Because "[t]he legislative focus of the assault statutes [is] the protection of victims from mental harm," we held that "it is therefore permissible without offending double jeopardy principles to convict and sentence a defendant for two counts of assault for pointing a gun at two persons at the same time." *Id.*; *cf. Bachicha*, 1991-NMCA-014, ¶ 13 (holding that a defendant's acts of pointing a rifle at each of multiple victims on multiple instances, "accompanied by verbal threats, constituted evidence from which the jury could properly determine that [the] defendant committed the separate offenses of aggravated assault and false imprisonment against each

15

victim"). In keeping with this legislative intent, we conclude here that even assuming, as Defendant argues, that Defendant threatened the Halls with the broken glass at the same time, it would still be permissible for him to be charged and punished with a separate count of aggravated assault for each victim, so long as each victim subjectively felt an objectively reasonable fear of imminent harm caused by Defendant's conduct.

{22}     Defendant cites to *State v. Cuevas*, 1980-NMSC-101, 94 N.M. 792, 617 P.2d 1307, *overruled by State v. Pitts*, 1986-NMSC-011, 103 N.M. 778, 714 P.2d 582, and *State v. Castaneda*, 2001-NMCA-052, 130 N.M. 679, 30 P.3d 368, to argue that we should disregard the emphasis on multiple victims and look more to the other factors contained within the *Herron* analysis. However, those cases were both decided prior to *Roper* and were both based on underlying statutory offenses that were not assault. *Compare Roper*, 2001-NMCA-093, *with Cuevas* 1980-NMSC-101, ¶ 2, *and Castaneda*, 2001-NMCA-052, ¶ 1. In addition, *Roper* discussed and rejected the rationale contained in *Castaneda*. *Roper*, 2001-NMCA-093, ¶¶ 11-12. Defendant's reliance on those cases is therefore unavailing. Because it is established that multiple counts of assault can fairly rest on the existence of multiple contemporaneous victims, each person who reasonably believed he was in danger from Defendant's conduct is a separate victim of the crime. Double jeopardy has not been implicated. *See Gallegos*, 2011-NMSC-027, ¶ 32 (noting that the function of double jeopardy in multiple

16

punishment cases is to prevent the sentencing court from prescribing a greater punishment than the Legislature intended).

**Sufficiency of the Evidence**

{23}     Defendant next contends that there was insufficient evidence to support the aggravated assault charges because, even if the evidence sufficiently established that each victim "subjectively feared an imminent battery with the broken glass, there was not sufficient objective evidence supporting that a reasonable person in each person's position would fear an imminent battery with broken glass." Defendant also questions that sufficient evidence was presented to support the jury's finding that the broken glass was a deadly weapon. We are not persuaded.

{24}     "When reviewing a verdict for sufficiency of the evidence, our role is to determine whether a rational fact-finder could determine beyond a reasonable doubt the essential facts necessary to convict the accused." *State v. Garcia*, 2005-NMSC-017, ¶ 12, 138 N.M. 1, 116 P.3d 72. We view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all permissible inferences to uphold the conviction, and disregarding all evidence and inferences to the contrary, to ensure that each element of the crime was established beyond a reasonable doubt. *See State v. Rojo*, 1999-NMSC-001, ¶¶ 19, 23, 126 N.M. 438, 971 P.2d 829. The reviewing court does "not re-weigh the evidence to determine if there was another

hypothesis that would support innocence or replace the fact-finder's view of the evidence with the appellate court's own view of the evidence." *Garcia*, 2005-NMSC-017, ¶ 12.

{25} In this case, as noted above, the jury was instructed pursuant to the Uniform Jury Instruction on aggravated assault with a deadly weapon and consistent with the statutory provision relating to aggravated assault with a deadly weapon. *See* UJI 14-305; § 30-3-2(A); § 30-3-1(B). The sufficiency of the evidence is to be measured against this instruction. *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883. Accordingly, we first consider whether there was sufficient evidence to support that Defendant's conduct caused each of the Halls to reasonably believe Defendant "was about to intrude on [their] bodily integrity or personal safety by touching or applying force to [them] in a rude, insolent or angry manner[.]" UJI 14-305; *Arrendondo*, 2012-NMSC-013, ¶ 14 ("The requirement that the victim must *actually believe*, and that a *reasonable person* in the victim's circumstances also *would believe*, that he or she was about to be assaulted indicates a dual subjective and objective test. . . . Therefore, the State's evidence must satisfy both a subjective and an objective standard.").

{26} With regard to Defendant's conduct toward Mr. Hall, Mr. Hall testified that when Defendant brought the glass up to shoulder height, Mr. Hall believed that Defendant was about to cut Mr. Hall's throat. Mr. Hall also testified that Defendant

18

held the glass up like a weapon and was waving the glass around and that Defendant pointed the glass toward Mr. Hall like he was going to hit him. In addition, Mr. Hall testified that while holding the glass shards, Defendant kept saying that he was going to "whip every one of [their] asses," and otherwise saying what he was going to do to Mr. Hall, Jacob, and Luke.

{27} With regard to Defendant's conduct toward Jacob, Mr. Hall also testified that when Defendant saw that Jacob was holding a broken axe handle at his side, Defendant looked at Jacob and said, "What are you going to do with that stick? I'm going to take it out of your hand, shove it up your ass and make a popsicle out of you." Jacob testified that while holding the glass shards, Defendant went after him. Jacob also testified that he felt threatened by Defendant's actions. According to Jacob, Defendant walked back and forth, directing threats at each individual present and singled everybody out in turn. At times Defendant's threats were directed at individuals and at others they were directed at the group. This lasted for approximately thirteen minutes.

{28} With regard to Defendant's actions that were directed at Luke, Luke testified that while waving around the glass shards, Defendant threatened each person that was present. Defendant spoke directly at Luke, then at Mr. Hall, then he directed his threats at the next person. Luke testified that he felt threatened by Defendant's actions and words and that he was afraid of the way Defendant was holding the glass. Luke

also testified that Defendant acted as though he wanted to cut Luke's head off with the glass. Luke believed Defendant was going to cut someone with the glass shards and that he was "waiting" for Defendant to cut someone.

{29} Viewing this evidence in the light most favorable to the verdict and indulging all permissible inferences to uphold the conviction, we conclude that there was sufficient evidence for the jury to find that Mr. Hall, Jacob, and Luke each reasonably feared an imminent battery with broken glass by Defendant. Although Defendant's conduct occurred during the course of a single altercation, there was evidence that Defendant made specific threatening remarks and gestures to each individual who was present. Moreover, a rational jury could find that it was objectively reasonable for Mr. Hall, Jacob, and Luke each to fear Defendant was about to intrude on their bodily integrity or personal safety by touching or applying force to them in a rude, insolent, or angry manner, when Defendant was posturing with shards of broken glass in both hands and explicitly threatening to injure each of the victims over the course of a thirteen-minute period that occurred within the larger context of an ongoing dispute.

{30} Defendant also argues that there was insufficient evidence that Defendant used a deadly weapon during the assaults. Defendant contends that, although he "held a bigger piece of glass in his right hand in a threatening manner, witnesses also acknowledged that he was holding multiple pieces of glass in his hands (as though merely picking them up) and that he could not grasp the bigger piece in his right hand

20

too hard without cutting himself." Defendant also points out that, although several shards of the broken bottle were admitted into evidence and reviewed by the jury, the bigger piece of glass was not. We will not re-weigh the evidence, and in light of the testimony at trial regarding the threatening manner in which Defendant held and gestured with the glass, and the fact that the jury was able to observe several pieces of glass that came from the bottle Defendant broke, we conclude that a rational jury could have found that the broken glass Defendant used was a deadly weapon. *See State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862 (noting that the relevant question on appeal is whether any "rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction"). Defendant's convictions for aggravated assault with a deadly weapon are affirmed.

**Jury Verdict Without Juror's Question Being Answered**

{31}     Defendant next argues that his rights to a unanimous verdict and to a fair and impartial jury were violated when a juror's factual question—whether Mr. Hall testified that he felt threatened—went unanswered before the jury was allowed to return its verdict. We review this issue for fundamental error. *See State v. Harrison*, 2010-NMSC-038, ¶ 10, 148 N.M. 500, 238 P.3d 869 (stating that the appellate courts review issues that were not properly preserved below for fundamental error).

{32}     We do not see any fundamental error here because, even assuming there was error, it would be harmless. In order to find all of the requisite elements and to convict

Defendant on Count I for aggravated assault with a deadly weapon against Mr. Hall, as the jury did, it must have collectively concluded that Mr. Hall testified he felt threatened. Moreover, even if the district court had played back Mr. Hall's testimony to the jury before allowing it to return a verdict, the result would be the same, because Mr. Hall did in fact testify that he felt threatened. We will not correct constitutional error when there is no reasonable possibility it affected the outcome of a case, and need not consider this issue further. *State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110 (explaining that "a constitutional error is harmless when there is no reasonable *possibility* it affected the verdict" (alteration, internal quotation marks, and citation omitted)).

**Jury Exposure to Extrinsic Information**

{33}    Finally, Defendant argues, pursuant to *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, that his rights to a fair and impartial jury and to due process were violated because a juror strayed from the juror room during deliberations to inform the district court and the parties that the jury had reached a verdict. Because this occurred when the parties were discussing how to respond to the juror question, Defendant "asserts that the juror was exposed to extrinsic information and that this extrinsic information can be presumed to have impacted at least that juror's view of the case." Because

Defendant did not preserve this issue, we review it for fundamental error. *See Silva*, 2008-NMSC-051, ¶ 11.

**{34}** In order to show that the juror's misconduct exposed the jury to extrinsic information, a party's mere allegation is insufficient. *See State v. Mann*, 2002-NMSC-001, ¶ 19, 131 N.M. 459, 39 P.3d 124. "[R]ather, Defendant must make an affirmative showing that some extraneous influence came to bear on the jury's deliberations." *Id.* (internal quotation marks and citation omitted). Here, Defendant has failed to make any affirmative showing that the jury was exposed to any extraneous influence. Furthermore, Defendant cannot make this showing, when the jury had already reached its verdict at the time the juror left the jury room, and when there is nothing to suggest that the verdict changed after the jury initially reached it.

**CONCLUSION**

**{35}** For the reasons set forth above, we affirm Defendant's convictions on all three counts of aggravated assault with a deadly weapon.

**{36}** **IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Judge**

**WE CONCUR:**

23

_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**MICHAEL E. VIGIL, Judge**